Filed Oct. 31, 1884.

———◆———

No. 11,697.

. NORWOOD, ADMINISTRATOR, *v.* HARNESS ET AL.

DECEDENTS' ESTATES.—*Deposit by Administrator in Bank.*—*Liability for Loss.*
—If an administrator deposit funds of the estate, which he must keep, in a bank of good repute for solvency, and which he believes to be solvent, he is not liable for loss resulting by failure of the bank; but it is otherwise if the bank be reputed of doubtful solvency, and by the use of reasonable diligence he might have known it.

SAME.—*Suits against Administrator on Liability of Decedent.*—An administrator can not, under the statute, R. S. 1881, section 2311, *et seq.*, be joined as defendant in a suit on a joint and several bond executed by his intestate, and the pendency of such a suit is no reason for delay of final settlement.

From the Marion Circuit Court.

*R. Hill* and *J. W. Nichol,* for appellant.

*L. Ritter, E. F. Ritter* and *B. W. Ritter,* for appellees.

BICKNELL, C. C.—This is an appeal by an administrator from a judgment of said court requiring him to make a final settlement report in ten days, and to pay into court for distribution the moneys with which he was chargeable.

A citation had been issued on petition of the appellees, requiring the administrator to make a final settlement, or show cause why he should not.

In his answer to that citation he stated his appointment as administrator, on the 3d day of August, 1882; that his decedent, when he died, had $4,188.80 on deposit in the Indiana Banking Company, where he had kept his money since 1865; that said administrator was informed by Ingram Fletcher, a banker of Indianapolis, that said Indiana Banking Company was safe and solvent, and he also learned that many leading business men of Indianapolis were making deposits in said Banking Company; that in view of these facts, and believing said company to be solvent and safe, he had said sum of $4,188.80 transferred to his credit as such administrator, and afterwards kept it and moneys of his decedent's estate on deposit with said company; that he never knew and never heard that said company was insolvent or embarrassed, until it failed on the 10th of August, 1883; that he is a farmer living about six miles from Indianapolis, and had no safe way of keeping the money at home, and so far as he could learn, said company was as safe as any other bank in Indianapolis; that he had on deposit with said company when it failed $4,103.31, of which he had not been able to collect a dollar; that he has a judgment against said company for the full amount of said deposit, and has made proof in order to obtain a dividend from the receiver of said company, but has not yet received anything; that at the time of said failure, he was prosecuting a suit in the superior court of Marion county, on a note executed by William Smock and

Isaac Smock to said decedent, which was contested, and was also attempting to collect a note made by W. S. Thomas and John Thomas, and payable to him as administrator, and was trying to be ready for final-settlement at the September term of said court, 1883; that no final settlement could be made before said September term, 1883, because at the close of the May term, 1883, of said court, a year had not elapsed since the date of his appointment as administrator; that on the 17th of September, 1883, he filed in this court a partial report as such administrator, showing a balance in his hands of $4,103.31, and that all of said balance was on deposit in said Indiana Banking Company when it failed; that said claim against William Smock and Isaac Smock was compromised about January 1st, 1884, and all the debts of said estate have been paid, and that said claim against William S. Thomas and John Thomas could be adjusted, and final settlement now made, but for the fact that no part of said deposit in the Indiana Banking Company can now be collected, wherefore he can not make a final report; that he is not personally liable to make good to said estate said loss by the failure of said company, but is bound to account for so much only of said money as can be collected from said banking company and its individual members. The answer concludes with a prayer that the final settlement of said estate be postponed, and that he be held accountable for so much only of said deposit as he may be able to collect.

To this answer the petitioners replied in two paragraphs:

1. A general denial.

2. That they are heirs at law of the decedent, and entitled to distribution; that there were no debts against said estate, and no claims in favor thereof; that long before the failure of said banking company, to wit, on May 11th, 1883, the Marion Circuit Court had settled the question as to the interests of the several heirs in the balance to be distributed, of which said administrator had notice; that said administrator kept the funds of the estate in the Indiana Banking Company,

Norwood, Administrator, *v.* Harness *et al.*

upon an agreement to receive interest therefor, although he kept his own private account with another bank; that before the failure of the Indiana Banking Company, more than a year had elapsed after the appointment of said administrator, who ought to have paid over and distributed all of said money before said failure, and by his negligence in failing so to do said money was lost; that said money was deposited by said administrator of his own motion, without order of court or consent of parties, although, at the time of said deposit, said company was, and long had been, insolvent and without capital, and that the facts as to its condition might and ought to have been known to said administrator, if he had made any effort to obtain them; that said loss was caused by said unlawful acts and omissions of said administrator. The reply concluded with a prayer that the administrator be ordered to pay over said money to the clerk of the court, and to file his report in final settlement.

A demurrer to the second paragraph of this reply, for want of facts sufficient, was overruled. A motion for a change of venue was made by the administrator and was overruled. The cause was submitted to the court for trial, and at the request of the administrator the court made a special finding of the facts and stated conclusions of law thereon. The following was the substance of the special finding:

1. That, on the 19th day of July, 1882, the said John Myers departed this life, in Marion county, Indiana, leaving certain heirs named in the finding, among whom are the petitioners.

2. That in a certain suit for partition the interests of all of said heirs in the balance to be distributed of the estate of said decedent was ascertained, of which said administrator had notice.

3. That, on August 3d, 1882, said administrator was appointed, and found on deposit in the Indiana Banking Company $4,188.48 belonging to said estate, said decedent having deposited his money in that bank since 1865; that said ad-

ministrator proceeded in the settlement of said estate, and that at the present time there are no debts or claims filed against the same, or known by said administrator to exist, that are unpaid ; that said administrator had in the bank of said company, on August 10th, 1883, $4,103.31 of the moneys of said estate, and is chargeable as administrator with $4,133.86 ; that all the debts due said estate are collected except a judgment for $97 against William S. Thomas and John Thomas, the stay upon which has expired, and it can be collected on call by the administrator ; this finding states also the amounts to be distributed to said widow and heirs.

4. Among the assets was a note for $1,000, made by William Smock and Isaac Smock, and payable to the decedent; that said Smocks were insolvent, and said administrator procured an order of court to compromise said claim for $100, but afterwards, and without calling the attention of the court thereto, he brought a useless suit on said note in another court, and that he is entitled to no credit for expenses connected therewith.

5. That said banking company failed on the 10th of August, 1883, and had been insolvent for five years, and in all that time had the reputation of being an unsafe and weak bank in Indianapolis and the surrounding neighborhood, which reputation said administrator could have known by reasonable or ordinary diligence.

6. That the decedent, John Myers, was one of the sureties of Daniel Hanway, treasurer of Marion county, on his official bond, for the period beginning September 3d, 1877, and ending September 3d, 1879 ; that on the 20th day of December, 1880, the auditor of Marion county brought suit on said bond in the Marion Superior Court; that said John Myers was not made a party to said suit, and said administrator was not made a party thereto until May 7th, 1884, about the time the testimony in this case was closed, and did not know such a suit had been intended until May 8th, 1884, on which day he was served with process, and that no claim against said John

Norwood, Administrator, *v.* Harness *et al.*

Myers' estate, on account of said bond, has been filed in this court.

Upon these facts the conclusions of law were as follows: That said administrator is not entitled to any credit for losses sustained by such deposit in the Indiana Banking Company, and that he has shown no reason why he should not immediately settle said estate; that said superior court of Marion county has no jurisdiction to enforce any claim against said estate in said suit upon said official bond; that said estate and funds, and the administration thereof, are under the control of this court, and can be reached only by a claim duly filed in this court, and that the order of the judge of said superior court, and the proceedings had in consequence thereof, present no excuse why said administrator should not settle the same immediately.

To these conclusions of law the administrator excepted.

A motion for a new trial made by the administrator was overruled, and a judgment was rendered requiring the administrator to pay the costs and to file in said court, within ten days, his final settlement report, and to pay into court, for distribution, the moneys with which he stands charged.

The administrator assigns errors on his appeal as follows:

1. Overruling the demurrer to the second paragraph of the reply.

2. In refusing to grant a change of venue.

3. In the conclusions of law.

4. In overruling the motion for a new trial.

5. In rendering final judgment against said appellant.

The last specification in this assignment of errors is too general to present any question. *Clayton* v. *Blough*, 93 Ind. 85. And the second specification, in reference to the refusal to grant a change of venue, presents no question, because that matter belongs to the motion for a new trial. *McCorkle* v. *State*, 14 Ind. 39; *Walls* v. *Anderson, etc., R. R. Co.*, 60 Ind. 56.

As to the first specification of the assignment of errors, we think there was no error in overruling the demurrer to

the second paragraph of the reply; that paragraph averred that more than a year had elapsed since the administrator's appointment, and that all claims against and in favor of the estate had been paid, and that the administrator might and ought to have made final settlement and distribution long before the failure of the bank; that the administrator left the money in the bank for the purpose of securing four per cent. interest, and that by his negligence the money was lost.

The principal question in the case arises on the third specification of error, which is that the conclusions of law upon the facts found were erroneous, and upon the first three reasons for a new trial, which are substantially that the findings were not sustained by the evidence.

The first conclusion of law presents the question, when is a trustee liable for losses sustained by the failure of a bank having on deposit his trust money? On this subject the general rules which govern trustees are applicable to administrators.    2 Williams Ex'rs, 1717, 1781.

"With respect to losses sustained by the failure of bankers, or other persons into whose hands the money of the testator has been deposited by the executor, the rule, at least in equity, seems to be that when the deposit was made from necessity, or conformably to the common usage of mankind, the executor will not be responsible for the loss."    2 Williams Ex'rs, 1545.

In *Churchill* v. *Hobson*, 1 P. Wms. 241, the Lord Chancellor HARCOURT said: "Neither do I think the executor Churchill ought to be chargeable for the 500*l.* by him paid to Goodwyn, he having been the cashier with whom the testator in his lifetime chose to entrust his money, and therefore the executor ought not to suffer for having trusted him, whom the testator himself in his life trusted."

In *Knight* v. *Plymouth*, 3 Atk. 480, where a receiver in the country had collected rents, and instead of sending the money to London in specie, had remitted it in bills of exchange upon London, procured from one Winsmore, which

were afterwards dishonored, Lord Chancellor HARDWICKE said : " It would be very hard to oblige the receiver to make good a loss which was not owing to any default of his, but as the sum was large, it was a necessary precaution to remit it by bills, rather than in specie, and at the time the money was paid to Winsmore, he had no reason to doubt its being lodged in a safe hand."

In the case of *Belchier, Ex parte,* Ambler, 219, Lord HARDWICKE said : " If trustee appoints rents to be paid to a banker * * and the banker afterwards breaks, the trustee is not answerable."

In *Rowth* v. *Howell,* 3 Vesey, 565, the funds of a testator were in his banker's hands when he died ; they were left there by his executor, and were subsequently lost by the failure of the banker. The Chancellor, Lord LOUGHBOROUGH, held that the executor ought not to be charged, and he said : " If he had taken them " (the securities) " to his chambers, he would have been liable to any casualty that might have happened."

In *Adams* v. *Claxton,* 6 Vesey, 226, negotiations were pending for the appointment of another trustee, and certain moneys were temporarily deposited with one Nightingale, a banker, who stopped payment. The deed of trust contained no direction for depositing the money with a banker, yet the Master of the Rolls said : " The defendant Claxton is not to be charged with the money deposited in Nightingale's bank."

In Williams on Ex'rs, 2049–50, it is said that, even if an executor has admitted assets before suit, if a strong case be made out, he may be relieved from the admission, as if the money were in a banker's hands who failed.

In 2 Story Eq. Jur., section 1269, it is said of a trustee : " So, if he should deposit the money with a banker in good credit, to remit it to the proper place by a bill, drawn by a person in due credit, and the banker or drawer of the bill should become bankrupt, he would not be responsible. The rule, in all cases of this sort, is, that, when a trustee acts by other hands, either from necessity, or conformably to the

common usage of mankind, he is not to be made answerable for losses."

In *Swinfen* v. *Swinfen*, 29 Beav. 211, an executrix had the money of her testator's estate in a private bank which became bankrupt and the money was lost. The Master of the Rolls allowed the executrix a credit for the amount lost.

In *Johnson* v. *Newton*, 11 Hare, 160, a testator had 3,000*l* in the hands of his bankers, and his executors continued the deposit; about nine months afterwards the bankers became bankrupt, and the estate lost thereby 1,000*l*. A master had reported that "there were not any purposes of their trust which rendered it necessary for the executors to retain the balance, or any part of it, with the bankers." Yet the court held that the executors were not answerable for the loss, and said: " I think if the court should hold parties in that situation to be liable for losses occurring under circumstances like the present, it would become impossible to find proper persons to accept the duty."

In Hill on Trustees, 573, it is said: " So where the trust funds are properly deposited with a banker or agent, who fails, the trustee will be allowed the sum so lost."

In *Cornwell* v. *Deck*, 8 Hun, 122, an administratrix having kept the money of the estate in her house, instead of depositing it in a bank, the nearest bank being twelve miles distant, the money was stolen, she was held liable, and the Supreme Court of New York, said: " It is repeatedly held that if a trustee, in the exercise of his best judgment, deposits money in a bank of good repute, he is not liable in the event of the failure of the bank. * * Her husband had kept a bank account, of which she was aware. Although the bank was some twelve miles off, he had deemed it proper to deposit in it there, and she could and should have done the same."

In Wharton on Negligence, section 519, we find the following: "A * * trustee, * or executor, has currency in hand belonging to his trust. Is he to keep this in his own house? This would be negligent, and would make him liable in case

of loss, except under extreme circumstances of *vis major.* His duty is to deposit such funds in bank; and this duty is satisfied, apart from statutory limitations, if the bank, at the time of deposit, is in good reputation, and if there is nothing in way of public rumor subsequently occurring which would lead a good business man to withdraw his funds."

" Trust moneys may be deposited for a reasonable time in a bank having good credit, if the deposit is made to the credit of the trust estate, and not in the trustee's individual name and account; and the trustee does not become liable for a loss occasioned by a failure of the bank under these circumstances." 2 Pomeroy Eq. Jur., section 1067. And see *McCabe* v. *Fowler,* 84 N. Y. 314.

The result of the foregoing authorities is that a trustee is not liable merely because, instead of undertaking to keep the trust money safely in his own house, he deposits it in a private bank which fails, nor because the bank is weak, unless that fact was known to the trustee, or might have been known by the exercise of ordinary prudence and diligence. The question in all such cases is, was the trustee reasonably prudent and diligent in making or continuing the deposit? If so, he will not be liable, although the bank was and had been insolvent. Such insolvency will not affect him unless he knew it, or unless it was generally known, or unless there were general rumors, injuriously affecting the credit of the bank, which were known to the trustee or might have been so known by reasonable diligence. There is a class of cases in which trustees have been held liable for losses on investments, made contrary to the directions of the instrument creating the trust, or without any authority to invest, or upon personal security merely. *Rehden* v. *Wesley,* 29 Beavan, 213; *Barney* v. *Saunders,* 16 How. 535; *Darke* v. *Martyn,* 1 Beavan, 525; Perry Trusts, section 465.

But even in relation to such investments, the author last cited, in the section just referred to, says: " In States where there are no fixed funds or securities in which trustees shall

invest, the fact that a testator has invested his property in particular stocks, shares of corporations, mortgages, or other securities, thus indicating his confidence in such investments, will go far to justify the trustees in continuing them."

There is a clear distinction between an investment and a deposit. In the former the trustee loses the control of the money; in the latter he retains it. His business is to keep the money safely, and banks are commonly used as safe places of deposit by prudent men. There is nothing in the decisions upon investments which impairs the force of the cases above cited as to deposits, or changes the rule to be deduced therefrom as hereinbefore set forth.

The first conclusion of law in the present case states that the administrator is not entitled to credit because of any loss sustained by the estate in consequence of its money being on deposit in the Indiana Banking Company at the time of its suspension and failure. The facts found on which this conclusion rests are:

1. That the intestate, when he died, in July, 1882, had $4,188.48 on deposit in the Indiana Banking Company; that he had kept his money on deposit in that bank for five years, and that the administrator had in said bank, on the 10th of August, 1883, $4,103.81, and is chargeable as administrator with $4,133.86. These facts appear in the third special finding.

2. The fifth special finding states that said bank failed on the 10th of August, 1883, and was then, and for five years last past had been, insolvent; and that during all of said years it had the reputation of being an unsafe and weak bank in Indianapolis and the surrounding neighborhood, which reputation said administrator could have learned by using reasonable or ordinary diligence.

In considering an exception to conclusions of law the facts are taken to be correctly found; the correctness of the finding can be disputed only by a motion for a new trial on the ground that the findings are not sustained by the evidence. Taking the facts as correctly found, as, for the present pur-

pose they must be taken, there was no error in the first con-
clusion of law.

The second conclusion of law is, in substance, that the suit
and proceedings in the superior court of Marion county pre-
sented no sufficient reason why said administrator should not
settle said estate.    It will be remembered that the adminis-
trator was appointed on the 3d of August, 1882.

The second conclusion of law rests upon the sixth special
finding, which is as follows:

The decedent was one of the sureties on the bond of Samuel
Hanway, as treasurer of Marion county, for the term begin-
ning September 3d, 1877, and ending September 3d, 1879;
that suit was brought on said bond in the superior court of
Marion county against Hanway and some of his sureties, on
December 20th, 1880; that the decedent, in his lifetime, was
not made a party to that suit, nor was said administrator
made a party thereto until May 7th, 1884, at about the time
when the testimony in the present suit was closed, nor had
the administrator any knowledge that any step was taken, or
in contemplation toward making him a party to said suit until
May 8th, 1884, on which day the summons in said suit was
served upon him, and that no claim against the estate of said
decedent has been filed in the Marion Circuit Court upon
said bond.

Section 2310, R. S. 1881, was amended by section 5 of the
decedents' act of 1883, Acts 1883, p. 153, and now provides
that no action shall be brought by complaint and sum-
mons against an administrator for the recovery of any
claim against the decedent, but the holder thereof shall file
a statement thereof in the office of the clerk of the court
in which the estate is pending, accompanied by the affi-
davit of the claimant, etc., and if such claim be filed after
the expiration of one year from the giving of notice by the
executor or administrator of his appointment, it shall be
prosecuted at the costs of the claimant, and if not filed at

least thirty days before final settlement of the estate, it shall be barred except as hereinafter provided in case of liabilities of heirs, devisees and legatees. The exceptions here referred to relate to the claims of creditors under disabilities and do not affect the present question. R. S. 1881, section 2442, et seq.

Heretofore it has been proper to join the administrator of a deceased joint obligor in an action against the survivors on the joint contract, but the statute just mentioned and sections 2311 to 2316, R. S. 1881, introduce new rules. Section 2311 provides that "No action shall be brought by complaint and summons against any executor or administrator and any other person or persons, or his or their legal representatives, upon any contract executed jointly, or jointly and severally, by the deceased and such other person or persons, or upon any joint judgment founded thereon; but the holder of said contract or judgment shall enforce the collection thereof against the estate of the decedent only, by filing his claim as provided in the preceding section." Section 2312 is as follows: "Every contract executed jointly by the decedent with any other person or persons, and every joint judgment founded on such contract, shall be deemed to be joint and several for the purpose contemplated in the last preceding section; and the amount due thereon shall be allowed against the estate of the decedent as if the contract were joint and several."

The other sections above mentioned, to wit, sections 2313 to 2316, R. S. 1881, regulate the extent of the liability of the estate of a decedent who was a surety or a co-surety.

Under the foregoing statutes, the pendency of the suit in the superior court of Marion county afforded no reason why the estate should not be settled, the year having expired, at the end of which it was the duty of the administrator to settle the estate. The decedent himself not having been a party to the suit which was commenced in his lifetime, and no claim having been filed in the Marion Circuit Court in relation to the decedent's liability on said bond, there was no

claim existing of which the Marion Circuit Court or the administrator was authorized to take notice.   There was, therefore, no error in the second conclusion of law.

The next question is presented by the first three reasons for a new trial, which are substantially, that the findings were not sustained by and were contrary to the evidence.

It will not be necessary to consider any of the special findings except so much of the fifth as asserts that the Indiana Banking Company at the time of its failure, and for five years last past, " had the reputation in Indianapolis and the surrounding neighborhood of being an unsafe and weak bank, which reputation said administrator could have learned by using reasonable or ordinary diligence."

The word " reputation " used in such a connection, without limitation, implies generality, it means public opinion in the community ; the " reputation of being a weak and unsafe bank" can not exist unless there is, at least, something in the way of *public* rumor that would lead a good business man to withdraw his funds.   See the citation, *supra,* from Wharton Neg.

The question is, does the evidence show any such public rumor or general suspicion as to the Indiana Banking Company ?   The question as to whether the bank was actually insolvent is not the controlling question.

There is no pretence that such actual insolvency, if it existed, was known to the administrator, or could have been known by him in the exercise of any ordinary diligence.

He found the money in the bank ; the decedent kept his money there for five years next before his death ; the administrator saw men going in there depositing large sums of money, and so far as he could see everything was going on all right ; about thirty other banks and bankers kept their deposits there ; at the time of the failure there were from fourteen to sixteen hundred depositors there, embracing some of the leading business men of Indianapolis, one of them depositing to the amount of a million of dollars a year ; only two

of the ten banks then° existing in Indianapolis had a larger line of deposits than this bank. It seems impossible that, under such circumstances, there could have been any public rumor or any general reputation injuriously affecting the credit of the bank. But the evidence shows conclusively that in fact there were no such public rumors and no such general reputation.

The evidence shows that the bank had become embarrassed, and perhaps really insolvent, by taking too much real estate and by the suspension of the First National Bank, and that certain persons, who had confidential means of knowledge, were aware of this, and that they understood that the bank was weak; but there is no testimony at all that at the time of the testator's death, or between that time and the failure of the bank, such matters were generally known, nor that there were any public rumors or general reputation injuriously affecting the bank's credit. On the contrary, the evidence showed conclusively that the general public opinion was that the Indiana Banking Company was a safe place of deposit, from the time the administrator was appointed until the time of its failure. The administrator, however, did not rely on this public opinion alone; within a week after his appointment, he inquired of Ingram Fletcher, a banker of Indianapolis, with whom he had kept his own bank account for many years, whether the Indiana Banking Company was good, and was told by him that it was, and to leave the money until it should be paid into court, and that he "need not lose a moment's sleep over it," and that if he, Fletcher, learned anything indicating that the Indiana Banking Company was not good, he would let him know.

Where there is testimony tending to sustain the finding, it can not be disturbed, but here the administrator was not liable unless negligent; and there was no evidence tending to show negligence. In such a case the judgment is always reversed. *Jeffersonville, etc., R. R. Co.* v. *Bowen,* 49 Ind. 154; *Jamieson* v. *Miller,* 54 Ind. 332; *Roe* v. *Cronkhite,* 55 Ind. 183;

*Butterfield* v. *Trittipo*, 67 Ind. 338 ; *Davis* v. *Grater*, 62 Ind. 408. The evidence did not tend to prove the existence of every fact necessary to justify the finding. *Sharp* v. *McBride*, 69 Ind. 396 ; *Ray* v. *Simons*, 76 Ind. 150 ; *Kitch* v. *Schoenell*, 80 Ind. 74 ; *Stringer* v. *Northwestern M. Life Ins. Co.*, 82 Ind. 100. We think that the finding, that " for five years this bank had the reputation of being an unsafe and weak bank in Indianapolis and the surrounding neighborhood, which reputation said Norwood could have learned by ordinary or reasonable diligence," is contrary to the evidence, and that, therefore, the court erred in overruling the motion for a new trial. This result renders it unnecessary to consider any of the other reasons alleged for a new trial, or any other of the errors assigned.

Per Curiam.—It is therefore ordered, on the foregoing opinion, that the judgment of the court below be and the same is hereby in all things reversed, at the costs of the appellees, and this cause is remanded for a new trial.

