## POWELL et al., Appellants, v. HURT et al.

### IN BANC.

1. **Administrators:** CARE AND SKILL REQUIRED. Administrators
and executors occupy the position of trustees to those interested
in the estate, and are liable only for the want of due care and skill;
the measure of such care and skill being that which prudent men
exercise in the direction and management of their own affairs.

2. ———: ———: FAILURE TO COLLECT NOTE. Executors permitted
a note given to their testator to run eleven months after its
maturity during which time the makers failed. They had been
insolvent since the note was made, but were considered solvent,
and had high financial credit up to the time of the failure. The
note bore ten-per-cent. compound interest, and was not needed
for distribution. In the opinion of two witnesses the makers if they
had been pressed for payment would have paid it out of trust
funds in their possession. *Held*, that the executors were not guilty
of negligence in failing to collect the note, and could not be
charged therefor in their final settlement.

*Certified from Kansas City Court of Appeals.*

REVERSED AND REMANDED.

*Peak, Yeager & Ball* and *B. R. Dysart* for appellants.

(1) The prevailing rule in the state is that execu-
tors and administrators stand in the position of trustees
to those interested in the estate upon which they
administer, and are liable only for want of due care and
skill, and that the measure of care and skill required of
them is that which prudent men exercise in the direc-
tion of their own affairs. And when the executor acts
prudently in good faith for what he deems for the best
interest of the estate he is not liable, though it may
turn out afterwards he was mistaken in judgment.
*Merritt v. Merritt,* 62 Mo. 150, and authorities cited;

*Mosman v. Bender*, 80 Mo. 585 ; *Van Bibber v. Julian*, 81 Mo. 626 ; *Neff's Appeal*, 57 Penn. St. 91 ; *Keller's Appeal*, 8 Penn. St. 288 ; *Watkins v. Stewart*, 78 Va. 111. (2) Applying this rule, we contend that under the undisputed facts in this case the court erred in refusing to allow the executor's credit for said note of Benedict and Malone. (3) The policy of the law is to deal leniently with executors when they act in good faith and with sound discretion, as in administering upon estates cases must arise when they are absolutely required to use their discretion. *Gamble v. Gibson*, 59 Mo. 596 ; *Julian v. Abbott*, 73 Mo. 580. (4) An executor is not an insurer in any sense of the word. *Fudge v. Dunn*, 51 Mo. 264 ; *State ex rel. v. Meagher*, 44 Mo. 356 ; *Foster v. Davis*, 46 Mo. 268. (5) The provisions of the will with reference to the manner and time of collecting the assets and distributing the same are merely directory, and do not and cannot change the right, duties or liabilities of the executors. See authorities cited, *supra*.

*John T. Jones* for respondents.

(1) Hurt and Powell by agreement divided the notes of deceased between them for collection, but this relieves neither, and each is chargeable with the negligent acts of the other as well as himself. Williams on Executors, 1548, and cases cited ; 8 Cent. L. J. 63 ; 11 Cent. L. J. 216 ; 13 N. J. Eq. 308. (2) An executor qualifying must follow the direction of the will implicitly or make himself liable. *Weigan's Appeal*, 28 Penn. St. 471 ; Williams on Executors [ 1855 Ed.] 1530, and cases cited. *Booth v. Booth*, 1 Beav. 125. (3) These executors, to relieve themselves, must show that this note could not have been collected while in their hands. 62 Mo. 460 ; *State ex rel. v. Taylor*, 12 Cent. L. J. 382 ; 72 Mo. 656 ; Williams on Executors, 1530 ; *Styles v. Guy*, 4 Y. & Coll. 571 ; *Williams v. Nixon*, 4 Beav. 472 ; *Tebbs v.*

*Carpenter*, 1 Madd. 298; *Julian, Adm'r, v. Abbott*, 73 Mo. 580; *Powlson v. Johnson*, 29 N. J. Eq. 529; *Fisher v. Killnous' Ex'rs*, 18 N. J. Eq. 229; *Holcomb v. Holcomb*, 11 N. J. Eq. 477. (4) An executor or administrator is held to a much stricter account than a trustee or guardian. 10 Casey, 474; 4 Johnson's Chancery, 619; Williams on Executors, 1530, and cases cited.

*John F. Williams*, also, for respondents.

(1) When executors proceed without directions of the will, or an order of court, they assume the risk, and the law holds them to a strict accountability. Laws of Trusts and Trustees, Tiffany & Bullard, 629, 630; *Howe v. Earl of Dartsmouth*, 7 Ves. 137; 62 Mo. 150; Williams on Trustees, 1530. (2) If the executors had been clothed by the will with discretionary power in the matter of the collection of this note, then the court might say, in view of the surrounding circumstances, that they had not abused their discretion. In such case it might so find, but if it did, even in that case, it would run counter to the law as written. It cannot be said, even in the absence of directions in a will, that it is prudent for executors to let an unsecured note run for eleven months after it is due, and make no effort to collect it or secure it. The law of trusts does not favor mere personal security, but requires such outstanding debts to be collected at once, even though the testator himself created the debt by a loan (as in this case) on what he considered an eligible investment. *Powell v. Evans*, 5 Ves. 339; *Bullock v. Wheatley*, 1 Coll. 130; *Styles v. Guy*, 1 Mac. & G. 422; Tiffany & Bullard, Trusts and Trustees, 581. (3) But when the will gives directions how the trust shall be executed, the law tolerates no negligent performance of the duties assumed. *Styles v. Guy*, 1 Mac. & G. 422; Williams' Executors, 1806; *Bacon v. Clare*, 3 N. Y. 294. (4) If the executor fails to follow the directions of the will,

and loss occurs, he is liable to make it good, however unexpected the result, however little likely to arise from the course adopted, and however free such conduct may be from any improper motive. *Clough v. Bond*, 3 M. & Cr. 496 ; Schouler's Ex'rs & Adm'rs, 336. ( 5 ) Executors voluntarily take upon themselves the burthen of the trust, and it is but just that they be held to a faithful and energetic discharge of its duties. *Cooper v. McGlinn*, 15 Ill. 435.

GANTT, J.—This is an appeal from the final judgment of the defendants, Peyton Y. Hurt and William R. Powell, as executors of the last will and testament of Henry A. Powell, deceased. Henry A. Powell resided in Macon county, Missouri. By his will, duly probated in said county, he appointed his son, Wm. R. Powell, and Peyton T. Hurt, his executors. The estate was large, amounting to something like $40,000.

On the final settlement in the probate court, the executors asked credit for a note of $1,000, given by C. H. Benedict, J. B. Malone and R. A. Malone, on the ground that the makers were insolvent at the time of its execution, ever since had been and were then. The probate court allowed the credit on the ground that this note could not be collected. From this judgment some of the heirs appealed. Three of these children declined and refused to disturb the finding of the probate court. In the circuit court the credit was disallowed, and from that judgment the executors appealed to the Kansas City court of appeals. That court by a majority opinion affirmed the judgment of the circuit court ( 31 Mo. App. 632 ), but PHILIPS, J., dissented, and, deeming the majority opinion in conflict with the line of decisions of this court, asked that it be certified to this court, which was done.

The facts are few and simple. On the twelfth of March, 1880, in his lifetime, Henry A. Powell loaned C. H. Benedict, J. B. Malone and R. A. Malone $1,000,

-and took their note of that date, payable one year after date, bearing interest at the rate of ten per cent. per -annum compounded. Henry A. Powell died in September, 1880. The executors qualified September 24, 1880.

The fourth item in the will was as follows: "*Fourth.* I direct my executors to collect all my notes and accounts due me as soon as the same can be done, and also convert all other personal property to cash within the first year of the administration, or as soon thereafter as may be."

The makers of this note did not pay it at its maturity, in March, 1881. The evidence shows that, a short time after it became due Hurt, one of the executors, presented the note to J. B. Malone, one of the makers, at the Macon Savings Bank, at Macon, Missouri. J. B. Malone was then and for some time had been president of that bank, and its general manager. The other makers of the note, C. H. Benedict and R. A. Malone, were in business in Kansas City, doing business as a firm, of which J. B. Malone also was a member, under the style of Benedict, Malone & Co. When Hurt presented the note to J. B. Malone at Macon he said that in consequence of floods and high water out west collections were slow, and times were close at Kansas City, and requested him to wait awhile. Wm. R. Powell, the other executor, and son of the testator, testified that he "happened to be in the Macon Savings Bank when Hurt presented the note for payment." Hurt said to him, "'What about time? They want further time on this note.' I said, 'Maybe they want to get away with it' *When* I said that I did not know that J. B. Malone was on it. Then J. B. Malone spoke up, and said, 'No, I am on that note.' And then *I* considered it good. Hurt said, 'It is good, and I'll risk it.' I had no suspicion of J. B. Malone's insolvency. I thought the note good when I found that J. B. Malone was on it."

On the fifteenth of February, 1882, the Macon Savings Bank made an assignment for the benefit of creditors, and, on the next day, Benedict, Malone & Co. were placed in the hands of a receiver. After the failure of the bank the fact was revealed that J. B. Malone, the Savings Bank and Benedict, Malone & Co. were all insolvent, and had been for four or five years.

The executors at once put the note in judgment at Kansas City, but the note not being a partnership obligation was excluded from the dividends arising from the sale of the partnership effects. Of course, not being an obligation of the bank, nothing could be obtained from its assignee. There were some few small tracts of land in J. B. Malone's name, but the evidence is uncontradicted that he held these in trust for the bank, having taken them in payment of debts due the bank. In a word, J. B. Malone was utterly and hopelessly insolvent.

Up to the time of the assignment J. B. Malone was considered a rich man. The bank was considered sound and safe. Nobody in that locality seems to have had the slightest question of its integrity. Hurt, one of the executors, had $3,000 on deposit when the crash came. The deceased himself seems to have had unlimited confidence in the bank and Malone. In addition to the note in question here, he held a past-due note of $3,000 on J. B. and R. A. Malone and C. G. Epperson. He also held certificates of deposits of the bank. After his death all these obligations, except this one, were collected, and distributed among the heirs. They redeposited a portion of this same money in the bank, and it remained there until the failure, and was lost. Hurt, the executor, says in his evidence: "I made no agreement or promise with Malone to extend the time. I simply concluded in my own mind to forbear suit and wait on him. The note was bearing ten-per-cent. compound interest, and I believed I could collect it one time as well as another. I would have *taken the same course had the note been my own.* I considered it unnecessary to sue."

Soon after the executors qualified, they called a meeting of the heirs to get an expression from them whether they desired the estate settled the first year. The heirs were all of age, and they decided they would wait and not sell the land until prices were better. The partnership creditors of Benedict, Malone & Co. only received some forty per cent. on their claims, and there was no surplus for any individual creditor of either of the members of the firm. The bank paid about thirty per cent. to depositors. Under these circumstances ought the executors be charged with this note and interest?

The liability of executors and administrators has been too often discussed in this court, and so firmly settled, there is little or no ground for difference of opinion as to the measure of their responsibility. They occupy the position of trustees to those who are interested in the estate which they undertake to administer, and are liable only for the want of due care and skill, and the measure of care and skill required of them is that which prudent men exercise in the direction and management of their own affairs. *Merritt v. Merritt* 62 Mo. 157; *State ex rel. v. Meagher*, 44 Mo. 356; *Clyce v. Anderson*, 49 Mo. 37.

In *Fudge v. Dunn*, 51 Mo. 264, this court said, speaking of an administrator: "He was not an insurer in any sense of the word. He was a trustee acting for the benefit of others. Chancellor KENT in *Thompson v. Brown*, 4 Johns. Ch. Rep. 619, says: 'This court has always treated trustees acting in good faith with great tenderness.' Lord HARDWICKE in *Knight v. Earl of Plymouth*, 3 Atk. 480; Dickens, 120, said: 'If there was no *mala fides*, nothing wilful in the conduct of the trustee, the court will always favor him. For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of anxiety and trouble, it

is an act of kindness in anyone to accept it. To add hazard or risk to that trouble, and subject a trustee to *losses which he could not foresee*, would be a manifest hardship, and would deter everyone from accepting so necessary an office.'" And, again, in the same case, it was said: "It is sufficient to say that we regard this as a private trust, that we look upon the administrator as the representative of the deceased; and, if the deceased, if alive and acting as a prudent man, could not have prevented the loss, his representative ought to be exonerated under the like circumstances."

In *Gamble v. Gibson*, 59 Mo. 585, the executor had money in his hands belonging to the estate, which consisted of the national currency of the government. This money in 1864 was greatly depreciated as compared with gold. The testator in his lifetime invested in gold as a precautionary measure. The executor himself was carrying gold on his own private account. He accordingly purchased gold with the currency, and it turned out there was a loss on it. He acted in good faith. This court said: "In the present case, the testator in his lifetime turned his ready money largely into gold, which he kept on deposit on account of his fears of the national currency. The executor did the same thing in regard to his own private affairs, and the most prudent men in the country pursued the same course. The intention was certainly good. * * * Under all these circumstances I think it would be inequitable to charge the executor with the loss."

The same general doctrine is reasserted and announced by Judge BLACK in *Booker v. Armstrong*, 93 Mo. 49. A harsher rule than this will deter good men from acting as administrators and executors, and thus the estates of dead men will fall into the hands of designing and unscrupulous persons. The rule is equitable and just and has, in practice, proved beneficial. Applying this rule to the facts in this case, how can we

charge the executors with this note? That they acted just as their *testator* would have done, is manifest from the fact that the testator, long after the bank was insolvent, kept large sums on deposit in it, and had and held notes on Malone past due to a large amount, and made this loan to Malone when he was hopelessly insolvent; that they acted just as his heirs and *beneficiaries* would have done, is attested by the fact that the heirs redeposited the very money these executors had collected from the bank and Malone in this very same bank, and they testified they considered Malone the bank; that they acted just as they did in their own affairs, is shown beyond the peradventure of a doubt, by the fact that Mr. Hurt had on deposit in the bank $3,000 of his own individual money when it failed. Surely, he could not well have given stronger evidence that he thought it prudent to trust Malone.

We have the silent testimony of the testator that in his opinion Mr. Hurt was a prudent man. Men of large estates are not apt to insist upon careless and negligent men administering upon their estates. On the contrary, they select the most faithful friend and the prudent business man to administer their estates. In this record we have one prudent man, who had amassed a large estate intrusting it to another prudent man, his most trusted friend, and both of these prudent men thought it safe to loan money to J. B. Malone, and, in so doing, they were doing what the whole community was doing. Moreover, we have in this case the significant fact that three of these heirs and distributees refuse to ask that these executors shall lose this note. Unless it can be maintained that a prudent man would have forborne for a few months to sue a man of unquestionable financial standing, on a security bearing the highest rate of interest, and for the collection of which there was not the least urgency, then Mr. Hurt acted in this matter as nine out of ten prudent men would have done. To charge him with a loss so unexpected, would

in our opinion be very inequitable. It is conceded by all the attorneys and courts who have discussed this case, that J. B. Malone and the Macon Savings Bank of which he was president had the unlimited confidence of the entire community.

William R. Powell, one of the sons of Henry A. Powell, and an heir and distributee, says that, when he learned that J. B. Malone was on the note, he considered it good ; that he had not the slightest suspicion of his insolvency, and to the same effect is the testimony of Webb Rubey and Mr. Dysart, lawyers whose profession often affords the greatest opportunities for learning the financial condition of the business men of their community. It is also beyond the cavil of a doubt, that for four or five years, notwithstanding these outward appearances, the Macon Savings Bank, J. B. Malone and Benedict Malone & Co. and all its members were utterly insolvent.

Henry A. Powell loaned these men his money. Had the crash come any time before March 12, 1881, the maturity of this note, not the slightest blame could or would have attached to the executors. It would have been too plain a case, but it is said now, that, notwithstanding these parties appeared absolutely solvent, *and, hence, gave no cause of alarm* to the executors ; and, notwithstanding if they had, without apparent reason, become alarmed and brought suit they would not have realized one dollar, yet because insolvent debtors often hide their true condition, and because two of the witnesses venture the opinion that rather than be sued J. B. Malone would have put this hands into the till of the Macon Savings Bank and paid his note out of moneys belonging to the depositors of that bank, these executors must be held for its loss. We submit, first, that the opinion of Rubey and Dysart, that Malone if thus pressed would have paid this note out of the funds of the bank is the merest conjecture, and is not based on facts. There is no proof that, after this note

came to their hands, J. B. Malone or Benedict or R. A. Malone paid one dollar of their individual debts, or that they ever were forced by fear of exposure to pay one of their individual debts. The only substantive facts to which they do testify exonerate these executors from the charge of negligence, and they are, that the reputation of the bank and the makers of this note for solvency was unquestioned, and, secondly, that they were in fact wholly insolvent, and if they had paid this note it would have been out of moneys belonging to other people, and which these executors, if informed of the truth, would have had no right as honest men to touch. We do not think the liability of a trustee can be placed upon such an extreme view.

But it is said, that while these executors come up to the standard of prudent men in that community who were doing *a running business*, that is not enough, they must adopt another standard, namely, "that of a prudent man who is engaged *in closing up his estate.*" We are unable to find any authority for restricting the rule within any such limits. It has not before been announced in any case in this state. A prudent executor or administrator must come up to the standard of a prudent man.

But let us, for argument's sake, adopt this rule. Take a man with an estate of $40,000. He has concluded to wind up his affairs, he has a note on parties who are reputed perfectly solvent. This note is bearing the highest rate of interest. It is deemed as good as the best bank in his vicinity. The deposit if collected and put in bank would bear a much less interest; would he be thought imprudent to let this note stand a year? Certainly not.

It appears from this evidence that these executors had distributed the great bulk of this estate. They thought they could collect this note at any time. They had not tied their hands by any definite extension of time. Considering the character and standing of

the makers of the note ; the remote possibility of loss ; the high interest it bore ; the fact that it was needed for distribution, it cannot be said they did any more than prudent men would have done in the management of their affairs.

II. But the uncontradicted evidence shows that during the whole of this administration the makers of this note were hopelessly insolvent. No witness pretended otherwise.

By section 240, of Revised Statutes, 1879, the law in force when this settlement was made, it is provided: "At his final settlement, the court shall give credit to the executor or administrator for all the debts which have been charged in the inventory as due to the estate, if the court be satisfied that such debt was not really due to the estate or that it had been balanced or reduced by offsets in any court of competent jurisdiction, *or the debtor was insolvent.*" R. S. 1889, sec. 233; *Williams, Adm'r, v. Petticrew,* 62 Mo. 460 ; *Julian v. Abbott,* 73 Mo. 580. Here the fact of insolvency is conclusively shown. There is not the slightest suspicion of fraud, collusion or intentional wrong-doing on the part of the executors. In the administration of this large estate, this one item alone is controverted.

It seems to us that by the plain terms of the statute, when the proof of the insolvency was made, the executors were most clearly entitled to credit for the note. The only argument against this view is that based upon the opinion or conjecture of Rubey and Dysart, that if the executors had pressed J. B. Malone for the note he would have paid it out of the funds in the bank, rather than have disclosed his insolvency. In the language of Judge PHILIPS : "This he could only do in violation of a high trust, and in effect robbing his depositors to pay another man's debt. It occurs to me that a decision of a court bottomed upon such questionable morality would not be creditable."

But if we are to indulge in speculation as to *what would have occurred*, had the executors pressed Malone for payment, and he had paid them to hide his bankruptcy, the most natural thing on earth for them to have done would have been to deposit it in that bank until they could distribute it. Had they done so and the bank failed, having maintained the reputation it had so long for solvency, and having been the trusted depository of their testator, the authorities all concur they would not have been liable. *Norwood, Adm'r, v. Harness*, 98 Ind. 134; *Jacobus v. Jacobus*, 37 N. J. Eq. 17.

In *Churchill v. Lady Hobson*, 1 P. Wms. 241, the Lord Chancellor HARCOURT said: "Neither do I think the executor, Churchill, ought to be chargeable for the £500 by him paid to Goodwyn, he having been the cashier with whom the testator in his lifetime chose to intrust his money, and, therefore, the executor ought not to suffer for having trusted him, whom the testator himself in his life trusted." In *Rowth v. Howell*, 3 Vesey, 565, the funds of a testator were in his banker's hands when he died. They were left there by his executor, and were lost by the failure of the banker. Lord Chancellor LOUGHBOROUGH held the executor ought not to be charged. 2 Story, Eq. Jur., sec. 1260; *Swinfen v. Swinfen*, 29 Beav. 211; *Johnson v. Newton*, 11 Hare, 160; Hill on Trustees, 573; Wharton on Negligence, 519; 2 Pomeroy's Eq. Jur., sec. 1067.

Our conclusion is that the judgment of the Kansas City court of appeals should be reversed, and it is so ordered, with directions to that court to remand the cause to the circuit court of Macon county, reversing the judgment of the said circuit court, and directing the circuit court to affirm the judgment of the probate court and certify its action to said probate court. SHERWOOD, C. J., and THOMAS, J., concur; MACFARLANE, J., concurs in the result. BARCLAY, BLACK and BRACE, JJ., dissent.

### SEPARATE OPINION.

MACFARLANE, J.—The standard of care and diligence exacted of executors and administrators cannot be laid down, with greater precision, than is done by the general rule given, and substantially agreed upon by both the majority and minority opinions, viz., that care, skill and diligence which reasonably prudent persons give to their own affairs when they are seeking to reach similar results.

This standard should, itself, be measured by the business customs and methods of the community in which the trust is to be discharged. It is manifest the same strictness should not be required of executors in communities in which the pursuits and business of the people are not speculative or hazardous, that would be demanded in commercial centers, in which the business is conducted largely on a system of credit, and in which fortunes are frequently made and lost in speculations and hazardous enterprises within a period of a few months. With this view of the case these executors were only required to exercise that care and diligence in the discharge of the duties of their trust, that prudent men would have exercised in the settlement of their own affairs in that particular community. Taking the reputed and universally accepted solvency of the payees of this note, and the business methods of the community into consideration, with the other facts and circumstances in evidence, I am unable to see that, under the rule of diligence, accepted by all, these executors should be held responsible for the loss of this note.

I am unwilling, however, to accept the doctrine of the majority opinion, that a trustee should be excused for want of diligence, upon showing that the payees of the note were in fact insolvent when the note was taken by the testator, though then and after the trust

was accepted they were engaged in business, and were reputed to be perfectly solvent. There are few persons, partnerships or corporations that fail in business whose insolvency cannot be traced back, frequently for years, though, by means of business methods and customs, they have maintained their financial and business standing and credit. There would be but few losses which could not be excused under such a rule. It is not a sufficient answer, from a legal or business standpoint, to say that one should not press his claim because the debtor may borrow from another the money with which to meet the demand, and thus jeopardize the interest of the lender. Business is not transacted on so high a moral plane, however desirable that it were otherwise. Few can be found so scrupulous when their personal interests are involved. The diligent creditor is favored both in law and equity.

For these reasons I am unable to concur in the second paragraph of the opinion of Judge GANTT.

BLACK, J. ( *dissenting* ).—Judges BRACE, BARCLAY and myself dissent from the opinion just filed and from the lines of argument by which the conclusion is reached.

The important facts are these : The deceased left an estate consisting of not to exceed $14,000 in notes, and also a landed estate. The executors qualified in September, 1880. Among the assets was a note dated the twelfth of March, 1880, due in one year for $1,000, signed by C. H. Benedict, J. B. Malone and R. A. Malone. On the twelfth of March, 1881, when the note matured, one of the executors presented it to J. B. Malone. Malone said that, in consequence of high waters out west, collections were slow ; that times were close in Kansas City, and requested the executors to wait awhile. No other demand of payment was made until the fifteenth of February, 1882.

The executors produced much evidence to the effect that, when the note matured, J. B. Malone was the president of a bank at Macon City, and was reputed and believed to be a wealthy man and had a good credit. He and the other makers of the note were partners in a wholesale grocery business at Kansas City, and the extent of their business is to some extent indicated by the evidence which tends to show that the stock of goods invoiced $98,000 on the fifteenth of February, 1882. On that day the bank failed, and the Kansas City house was placed in the hands of a receiver. After these failures it transpires that the makers of the note were all insolvent, and for four or five years had not had sufficient property to pay all of their debts. The note was not a partnership debt, and, hence, did not participate in the partnership assets. It is a total loss. On these facts the executors claim a credit for the amount of the note and accrued interest.

It has been repeatedly held by this court that executors and administrators are liable for the want of due care in collecting the assets of the estate, and the measure of that care is the diligence which prudent men exercise in the management of their own affairs. *Merritt v. Merritt*, 62 Mo. 151; *Booker v. Armstrong*, 93 Mo. 49. The administration law contemplates a speedy winding up of the estate, and, hence, it becomes the duty of the executor or administrator to collect in the assets with all reasonable diligence, and this, too, without any request from the creditors or distributees of the estate. Schouler on Executors & Administrators [2 Ed.] sec. 269. The diligence required is that of a prudent person engaged in a like business, for reasonable diligence can mean nothing short of this.

Now, in this case the executors let the note run for a period of eleven months after it matured, without making any effort to collect it. During that time no demand for payment was made. That the executors acted in good faith, and believed the note was good and

the makers solvent, is clear enough.   But it will not do to say, or hold, that an executor or administrator, whose duty it is to collect in the assets with all reasonable diligence, can thus indulge the debtors of the estate. The fact that the makers of the note were of good credit is no excuse for the delay.   The period of the delay in this case was far beyond that usually allowed as a period of credit in ordinary commercial transactions.   The rule that the executor or administrator must collect in the assets with all reasonable diligence forbids such delays as that allowed in this case.   The executors, in granting this indulgence, took upon themselves the risk arising therefrom.   To hold otherwise is to encourage a laxity in the administration of estates which must result in ruinous consequences.   It must be remembered that executors and administrators are allowed by the law full compensation for their services, and, in view of this fact, they should perform their duties with promptness.

It is true, some of the distributees do not object to the proposed settlement filed by the executors ; but how that can affect the right of those who do object is not readily comprehended.

In applying the rule that the executor or administrator must make the collections with reasonable diligence, we are, of course, to take into consideration the established customs of the locality ; but, in this case, the makers of this note were all engaged in a hazardous business, and this was well known to the executors. They permitted the debt to stand for eleven months, and that, too, without any effort to find out or ascertain the real and true financial condition of the debtors.   We cannot consent to any exposition of the law which approves such want of care and diligence on the part of those who accept a fiduciary position, a compensated trust.

But it is said there is no satisfactory evidence that this note would have been paid had payment been demanded.   The testimony of the two witnesses to the

effect that it would have been paid is, it is true, no more than the expression of an opinion; but it needs no such evidence to satisfy anyone that this note would have been paid had payment been demanded. The proof is that the debtors were doing a large and extensive business, and there is no pretense or claim that they did not pay their obligations when payment was asked. It must be remembered that the burden of proof is upon the executors to show that this note could not have been collected by the use of reasonable diligence. The very fact that these men were doing a large business, with no evidence that they did not pay their obligations as they matured, does not make out, or tend to make out, a case for the executors. It is the best of evidence that the note would have been paid.

But it is again insisted that, although these debtors were doing what appeared to be a flourishing business during this period of eleven months, still we must treat them as insolvent all the while, because it transpired in the end that they did not at any time have property enough to pay all of their obligations. The argument certainly has the merit of novelty. The vast number of persons who fail annually in business of almost every character and description, and yet pay their debts as they mature up to the day of their failure, must show that to give sanction to the argument is to place the estates of deceased persons at the mercy of all the hazards of going concerns, and that, too, in the face of the fact that the law looks to, and contemplates, a speedy settlement of the estates of deceased persons. Should such a doctrine prevail it must furnish a ready relief from liability on the part of executors and administrators for their own want of due care. To us it seems plain that the duty of the executors and their consequent liability must be measured by the facts as they existed when this note should have been collected.

We think the result reached by the majority of the court is not in accord with the policy of our

Dahlstrom v. The St. Louis, I. M. & S. Ry. Co.

administration law, or with the duties of executors and administrators as heretofore understood in this state, and we, therefore, dissent.

We deem it unnecessary to say any more in this case.